******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.*
# EDWARD BROZYNSKI
# (AC 47201)

Alvord, Moll and Keller, Js.

*Syllabus*

Convicted, after a jury trial, of the crimes of manslaughter in the first degree, assault in the first degree, manslaughter in the second degree with a motor vehicle, assault in the second degree with a motor vehicle, and operating a motor vehicle while under the influence of intoxicating liquor or drugs, the defendant appealed. He claimed that his right to a fair trial was denied due to prosecutorial impropriety and that a new trial was therefore required. *Held*:

The defendant's claim that the prosecutor acted improperly by failing to adhere to the trial court's instructions and continuing to make improper comments on multiple occasions was unavailing, as the court's ruling on defense counsel's objection to the first identified statement was ambiguous, there was no specificity as to what portion of the prosecutor's second comment was ruled outside the scope of evidence, and, in both cases, the prosecutor rephrased his question or statement in response to the court's rulings.

The defendant's claim that the prosecutor acted improperly by denigrating defense counsel on two occasions was unavailing, as, to the extent the defendant argued that the prosecutor's language implied that defense counsel intended to mislead the jury, he failed to demonstrate how the language amounted to such an implication, and the prosecutor's commentary was connected to the testimonial evidence offered by the defendant.

The defendant's claim that certain comments made by the prosecutor during closing argument were highly prejudicial in appealing to the jurors' emotions was unavailing, as the comments drew on the facts in evidence or the jury's common knowledge, were not unduly provocative, did not distract the jury from its appraisal of the facts, and/or were in response to the defendant's theory of defense.

The defendant's claim that the prosecutor made several comments during cross-examination of the defendant that were improper because they referred to facts not in evidence was, with one exception, unavailing, as the comments sought to impeach the defendant's testimony, were supported by evidence presented at trial, or sought to clarify the defendant's testimony.

This court declined to review the defendant's claim that the prosecutor improperly commented on the defendant's pretrial custody and supervision, as well as the potential penalties and consequences he would face if convicted, as it was inadequately briefed.

Although one of the prosecutor's comments to the defendant during cross-examination, specifically, his comment that the defendant "should feel terrible for [the motor vehicle collision], you killed two people," was improper, this

court concluded, pursuant to the factors set forth in *State* v. *Williams* (204 Conn. 523), that the impropriety did not deprive the defendant of a fair trial.

Argued March 24—officially released July 28, 2026

*Procedural History*

Substitute information charging the defendant with two counts each of the crimes of manslaughter in the first degree, assault in the first degree, manslaughter in the second degree with a motor vehicle, assault in the second degree with a motor vehicle, and operating a motor vehicle while under the influence of intoxicating liquor or drugs, brought to the Superior Court in the judicial district of Hartford, where the case was tried to the jury before *Gustafson, J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed*.

*Abigail H. Mason*, assigned counsel, for the appellant (defendant).

*Lena A. Arnold*, deputy assistant state's attorney, with whom, on the brief, were *Sharmese L. Walcott*, state's attorney, *John F. Fahey*, state's attorney, and *Samantha Magnani*, assistant state's attorney, for the appellee (state).

*Opinion*

ALVORD, J. The defendant, Edward Brozynski, appeals from the judgment of conviction, rendered after a jury trial, of two counts of manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (3), two counts of assault in the first degree in violation of General Statutes § 53a-59 (a) (3), two counts of manslaughter in the second degree with a motor vehicle in violation of General Statutes § 53a-56b (a), two counts of assault in the second degree with a motor vehicle in violation of General Statutes § 53a-60d (a), one count of operating a motor vehicle while under the influence of intoxicating liquor or drugs in violation of General Statutes § 14-227a (a) (2), and one count of operating a motor vehicle while under the influence of intoxicating liquor

or drugs in violation of §14-227a (a) (1). The defendant claims on appeal that his right to a fair trial was denied due to prosecutorial impropriety and, thus, a new trial is required. We affirm the judgment of conviction.

The following facts, which the jury reasonably could have found, and procedural history are relevant to our resolution of this appeal. On the evening of September 14, 2017, at approximately 11:45 p.m., the defendant, while driving his 2010 Honda Accord (Honda) west on Interstate 84, departed the highway via exit 38 westbound, hit the exit sign, and then drove west on Colt Highway. After traveling on Colt Highway for approximately one to two miles, the defendant switched from the right lane to the left lane at a high rate of speed. The defendant had difficulty operating the Honda within the lines of the left lane and the Honda crossed the center line into the single lane eastbound side, where he proceeded to drive the wrong way and along the guardrail.

Around that same time, Angelique Michaud was driving eastward in her 2015 Mazda 3 (Mazda) on the eastbound side of Colt Highway with three passengers: her husband, Benoit Boislard; her husband's cousin, Rejean St. Pierre (St. Pierre); and St. Pierre's wife, Lisette Prince St. Pierre (Prince St. Pierre). The four had been travelling from Quebec, Canada, to Farmington, Connecticut, to attend the funeral of a relative the next day. As Michaud was looking for their hotel, she saw the defendant's Honda heading directly toward them driving westward on the eastbound side of the highway. Realizing that she could not cross into the westbound side because there were two cars there and that she could not move to the other side of her lane due to the guardrail, she pressed the brake and, shortly thereafter, the Honda collided with her Mazda.

Law enforcement and public safety personnel responding to the scene of the collision found the defendant alone, seated in the driver's seat of the Honda with the top half of his body lying across the passenger seat. There was an odor of alcohol emanating from the defendant and the

Honda, and the defendant displayed characteristics consistent with being intoxicated, including red and glossy eyes, slurred speech, and the inability to focus on simple questions from first responders about his condition. The defendant was clothed and had his wallet with him.

An eyewitness and first responders rendered aid to the occupants of both vehicles until all occupants were transported to area hospitals. Although they tried to revive St. Pierre at the scene, he died due to the blunt trauma he sustained to his head, neck, and torso. Boislard died the next morning due to blunt injuries to his trunk and extremities. Prince St. Pierre was transported to the intensive care unit at Hartford Hospital, where she remained for three weeks until being transferred by medical flight to a hospital in Canada, where she was a patient for one and one-half months. She was then placed in rehabilitation, where she had to learn how to speak and to eat, and, although her daily functioning had improved since the accident, as of the trial, she still required assistance with most activities. Michaud sustained a broken right elbow and left wrist, which caused permanent nerve damage in two fingers and limited motion in her elbow. She also suffered from post-traumatic stress disorder as a result of the collision.

The defendant was transported to St. Francis Hospital, where his blood was drawn at 12:50 a.m. and then again at 4:55 a.m. The defendant's blood samples then were tested and stored by Collaborative Laboratory Services at St. Francis Hospital. Pursuant to a search warrant, Farmington police seized the defendant's blood samples from Collaborative Laboratory Services and had those samples tested by the Connecticut Forensic Science Laboratory (state lab) for the presence of drugs and alcohol. The test results from the state lab showed a blood alcohol content (BAC) of 0.18 for the 12:50 a.m. blood draw and 0.08 for the 4:55 a.m. blood draw. The samples also revealed the presence of zolpidem (also known as Ambien), oxycodone, and meprobamate, all of which were within the normal

therapeutic range, or what a physician typically would prescribe.

The defendant was arrested and charged in a substitute long form information with two counts of manslaughter in the first degree in violation of § 53a-55 (a) (3), two counts of assault in the first degree in violation of § 53a-59 (a) (3), two counts of manslaughter in the second degree with a motor vehicle in violation of § 53a-56b (a), two counts of assault in the second degree with a motor vehicle in violation of § 53a-60d (a), one count of operating a motor vehicle while under the influence of intoxicating liquor or drug in violation of § 14-227a (a) (2) and one count of operating a motor vehicle while under the influence of intoxicating liquor or drug in violation of § 14-227a (a) (1).

A jury trial was held over the course of seven days in June 2023. The state presented testimony from several witnesses, including eyewitnesses to the accident and the events leading up to it, law enforcement and public safety personnel, medical and laboratory staff from St. Francis Hospital, forensic examiners from the state lab, an expert witness in forensic toxicology, Robert H. Powers, two medical examiners from the Office of the Chief Medical Examiner, and the defendant's girlfriend. The defendant also testified. In describing the night of the accident, the defendant testified that, some time prior to the accident, he consumed two Bloody Mary drinks, took his prescription Ambien, and fell asleep. He testified that he did not intend to drive, had no recollection of driving, and never had experienced an episode of so-called "sleep driving" prior to the accident. During closing argument, defense counsel emphasized this theory of defense that Ambien caused the defendant to sleep drive and that sleep driving caused the accident.

The jury returned a verdict on June 22, finding the defendant guilty on all counts. The court sentenced the defendant to a total effective sentence of twenty years of incarceration, execution suspended after seventeen years, and three years of probation. This appeal,

challenging the conviction on the basis that the defendant was denied his right to a fair trial due to prosecutorial impropriety, followed. Additional facts and procedural history will be set forth as necessary.

On appeal, the defendant claims that, on more than twenty occasions during the prosecutor's cross-examination of the defendant, closing argument, and closing rebuttal argument, his "right to a fair trial was violated by prosecutorial impropriety." He contends that "[e]ach of these instances of impropriety are significant and impacted [his] right to a fair trial; however, cumulatively, they are even more harmful [as] all the improper questions and comments occurred on the final day of the trial." In response, the state argues that, "[w]ith the exception of a single gratuitous remark, which the state acknowledges that this court may find improper, the defendant's claims fail because none of the other instances the defendant cites to amount to prosecutorial impropriety." The state further asserts that, "even if this court finds that any impropriety occurred, it did not deprive the defendant of his right to a fair trial." We agree with the state.

We begin by setting forth the legal principles that guide our review of this claim. "In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry. . . .

"[O]ur determination of whether any improper conduct by the [prosecutor] violated the defendant's fair trial rights is predicated on the factors set forth in *State* v. *Williams*, [204 Conn. 523, 540, 529 A.2d 653 (1987)],

with due consideration of whether that [impropriety] was objected to at trial. . . . These factors include: [1] the extent to which the [impropriety] was invited by defense conduct or argument . . . [2] the severity of the [impropriety] . . . [3] the frequency of the [impropriety] . . . [4] the centrality of the [impropriety] to the critical issues in the case . . . [5] the strength of the curative measures adopted . . . and [6] the strength of the state's case. . . . The question of whether the defendant has been prejudiced by prosecutorial [impropriety] . . . depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties. . . . Under the *Williams* general due process standard, the defendant has the burden to show both that the prosecutor's conduct was improper and that it caused prejudice to his defense. . . . The two steps of [our] analysis are separate and distinct, and we may reject the claim if we conclude [that] the defendant has failed to establish either prong. . . .

"Because [some of] the claimed prosecutorial improprieties occurred during [both closing and] rebuttal closing argument, we also set forth the following legal principles. It is well established that prosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . When making closing arguments to the jury, [however, counsel] must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based [on] the facts in evidence and the reasonable inferences to be drawn therefrom. . . .

"Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case. [The prosecutor] is not only an officer of the court, like every attorney, but is also a high public officer, representing

the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent. . . . By reason of his office, he usually exercises great influence [on] jurors. . . . While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment [on], or to suggest an inference from, facts not in evidence, or to present matters [that] the jury ha[s] no right to consider. . . .

"Lastly, we note that defense counsel did not object to [many] of the [alleged improprieties at trial]. [O]ur Supreme Court has explained that a defendant's failure to object at trial to each of the occurrences that he now raises as instances of prosecutorial impropriety, though relevant to our inquiry, is not fatal to review of his claims. . . . This does not mean, however, that the absence of an objection at trial does not play a significant role in the determination of whether the challenged statements were, in fact, improper. . . . To the contrary, we continue to adhere to the well established maxim that defense counsel's failure to object to the [alleged improprieties at the time they occurred] suggests that defense counsel did not believe that [they were] [improper] in light of the record of the case at the time.[1]" (Footnote in original; internal quotation marks omitted.) *State* v. *Antwon B.*, 236 Conn. App. 428, 455–57, 348 A.3d 814 (2025), cert. denied, 354 Conn. 910, 349 A.3d 1094 (2026).

# I
## A
### Failure to Adhere to Court Rulings

The defendant first claims that the prosecutor acted improperly by ignoring the court's instructions and

---

[1] "[U]nder settled law, a defendant who fails to preserve claims of prosecutorial [impropriety] need not seek to prevail under the specific requirements of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), and, similarly, it is unnecessary for a reviewing court to apply the four-pronged *Golding* test." (Internal quotation marks omitted.) *State* v. *Antwon B.*, 236 Conn. App. 428, 457 n.18, 348 A.3d 814 (2025), cert. denied, 354 Conn. 910, 349 A.3d 1094 (2026).

continuing to make improper comments on multiple occasions.

"It is well settled that a prosecutor's failure to obey a trial court order concerning the admissibility of evidence, either while examining a witness or during argument, constitutes improper conduct. See, e.g., *State* v. *Ortiz*, 280 Conn. 686, 704, 911 A.2d 1055 (2006); see also *State* v. *Reynolds*, 118 Conn. App. 278, 292, 983 A.2d 874 (2009) (purposeful attempt by prosecutor to include inadmissible evidence 'may entitle the defendant to a new trial' . . . ), cert. denied, 294 Conn. 933, 987 A.2d 1029 (2010); *State* v. *Williams*, 102 Conn. App. 168, 176, 926 A.2d 7 ('evidentiary violations of a court order should be reviewed as prosecutorial [impropriety], not evidentiary errors'), cert. denied, 284 Conn. 906, 931 A.2d 267 (2007). Whether a prosecutor's improper comment or question has affected a defendant's due process rights is case specific and 'turns on the degree to which the breach undermines a trial court's ruling that protects the integrity of the fact-finding process by restricting the admission of unreliable or unduly prejudicial evidence.' . . . For a breach to constitute prosecutorial impropriety, the trial court's ruling must be unambiguous; an initially ambiguous order may be rendered 'unambiguous following [an] extended colloquy with counsel . . . .'" (Citation omitted.) *State* v. *Dabate*, 351 Conn. 428, 438, 331 A.3d 1159 (2025).

The defendant first claims that it was improper for the prosecutor to ask on cross-examination, "[D]o you think the fact that you drank alcohol and don't remember what happen[ed] that night excuses your behavior?" He asserts that this question was improper because the court had just sustained defense counsel's objection to the question: "[D]o you think because you drank alcohol and took an Ambien that that excuses your behavior?"

The colloquy occurred as follows:

"[The Prosecutor]: [D]o you think because you drank alcohol and took an Ambien that that excuses your behavior?

"[Defense Counsel]: I'm going to object.

"The Defendant: I had no intentions of going on and doing this, my intentions were to go to sleep.

"The Court: Sir, one second, sir. We have to question and answer; [Defense Counsel], did you have an objection?

"[Defense Counsel]: Yes, Your Honor. I just thought it was an improper question. He's already answered it though, so.

"The Court: I'm going to sustain the objection. You can move on with the next question, please.

"[The Prosecutor]: Sir, do you think the fact that you drank alcohol and don't remember what happen[ed] that night excuses your behavior?

"[Defense Counsel]: Objection, Your Honor. That's not a proper question.

"The Court: I'll sustain the objection."

The defendant contends that the court's order was clear and the question was improper. We are not persuaded.

We do not find that the court's ruling on the first objection was unambiguous. Without any specificity, the stated basis for the initial objection was simply that defense counsel "just thought it was an improper question." Although the court sustained the objection, it did not specify the ground on which it determined that the question was improper. The first question was not so obviously improper or inflammatory such that the prosecutor could not have any doubt as to the offending portion. Cf. *State* v. *Dabate*, supra, 351 Conn. 442 (finding state's argument that prosecutor could not have known which word trial court deemed objectionable strained credulity, as "[t]here can be no legitimate

doubt that the word 'Cheshire' was the offending word in the trial court's ruling, given the singular meaning of that term in the parlance of Connecticut's criminal justice system"). After the objection was sustained, the prosecutor rephrased the question so that it did not ask the defendant to reflect on his culpability as it relates to his theory of defense that the accident was caused by the alleged side effects of the Ambien medication. Accordingly, the question was not improper.

The defendant also claims that it was improper for the prosecutor to comment during the state's closing rebuttal argument: "Again, you didn't check your common sense at the door. Everybody knows not to mix alcohol with drugs." The context underlying this comment was as follows:

"[The Prosecutor]: [Defense counsel] also mentioned to you that there was no warning on the Ambien. Every single person, all of us, again, everybody has common sense here, you get a prescription, it comes with a long list of drug interactions, things you should and shouldn't do. Almost every single drug that you pick up at the drug store now comes with warnings about [how] you shouldn't mix it with alcohol.

"[Defense Counsel]: Objection, Your Honor. That's really outside the evidence.

"The Court: Yeah. I'll sustain the objection.

"[The Prosecutor]: Again, you didn't check your common sense at the door. Everybody knows not to mix alcohol with drugs."

The defendant posits that "[t]he prosecutor commented on the defense's theory by arguing that the defendant should have known not to mix Ambien with alcohol. The court ruled in the defendant's favor that the assumption should not be made . . . ." We cannot identify, nor does the defendant point to, any portion of the record in which the court stated that it sustained the objection on the grounds that the question improperly assumed that the

defendant should have known not to mix Ambien with alcohol. Defense counsel objected to the first comment on the basis that it was outside of the evidence and the court sustained the objection; however, there was no specificity as to what portion of the prosecutor's comment was ruled outside the scope of evidence. The prosecutor referenced generally the warnings written on prescription drug bottles—information that had not been introduced into evidence. After the court sustained the objection, the prosecutor omitted a significant portion of the statement and simply asked the jurors to use their common sense that everyone knows not to mix prescription drugs with alcohol. The prosecutor's appeal to the jurors, urging them to use common knowledge in deciding a fact, is not improper. See *State* v. *Devito*, 159 Conn. App. 560, 581, 124 A.3d 14 ("[r]emarks that are nothing more than a permissible appeal to the jurors' common sense do not constitute prosecutorial [impropriety]" (internal quotation marks omitted)), cert. denied, 319 Conn. 947, 125 A.3d 1012 (2015).

## B
### Denigration of Defense Counsel

The defendant next claims that the prosecutor acted improperly by denigrating defense counsel[2] on two occasions. In the first instance, the defendant argues that it was improper for the prosecutor to ask the defendant on cross-examination, "[W]here [did] you first hear that term sleep driving? From one of your attorneys?"

The following context is relevant to our review of this claim. On direct examination, the defendant testified

---

[2]To the extent that the defendant claims the prosecutor inappropriately commented on the defendant's right to counsel, the issue is inadequately briefed for failing to offer substantive analysis in support of his claim and, thus, we decline to review it. "We repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." (Internal quotation marks omitted.) *State* v. *James R.*, 138 Conn. App. 181, 186, 50 A.3d 936, cert. denied, 307 Conn. 940, 56 A.3d 949 (2012).

that, on the night of the accident, he consumed two Bloody Mary drinks, "took the Ambien sleeping pill [and] . . . went to sleep." He described: "I went to sleep, when I woke up, I was in the hospital . . . . And the doctor was talking to me saying, do you know you were in a car accident; do you know you were in Farmington? And I told the doctor, no. I don't know I was in a car accident. I don't know I was in Farmington. He asked me where you were, I said I was home sleeping, that's the last thing I remember, I don't have no recollection of driving the car." When asked if he "ever had side effects like sleep driving before," the defendant responded, "No. No." In response to defense counsel's question asking if he still takes the prescriptions he had taken on the night of the accident, he stated: "I do not take any medication now because I'm terrified of the side effect of what happened to me with Ambien, so I don't take nothing."

On cross-examination, the prosecutor questioned the defendant on his experience with sleep driving, asking: "[S]o, it just happened to be the night that you killed two people that you first had an episode of sleep driving, is that correct, sir?" The defendant replied, "That's 100 percent correct." The prosecutor also questioned the defendant on the general topic already discussed and about his communication with the prosecutor previously assigned to the case, prompting the following colloquy:

"[The Prosecutor]: And, in the letter from 2022,[3] you put in there that there may have been somebody else who walked away from the driver's side door of the car, correct?

"[The Defendant]: That's what the other attorney that was representing me told me.

"[The Prosecutor]: Well, sir, in 2022, that was last year, you were represented by [defense counsel], correct?

---

[3]The letter was introduced for identification purposes only and was not admitted into evidence.

"[The Defendant]: Yeah. But before him I had a different attorney and that attorney told me that.

"[The Prosecutor]: I understand that, but you wrote that letter because you wanted to put that forth as a defense that somebody else was driving, not you, is that correct, sir?

"[The Defendant]: No. That's no[t] correct.

"[The Prosecutor]: That's not correct, you just wrote that in the letter?

"[The Defendant]: I wrote that because the attorney I had before [defense counsel] told me that, which I didn't know.

"[The Prosecutor]: Well, sir, in fact it says in that letter please prosecutor, can you look into this, are you sure I was driving. Do you recall writing that, sir?

"[The Defendant]: Yeah, because the other attorney told me that." **(Footnote added.)**

Shortly thereafter, the prosecutor engaged the defendant in the following line of inquiry in which the alleged improper question was posed:

"[The Prosecutor]: You acknowledge drinking alcohol, correct?

"[The Defendant]: Yes. I had alcohol at home with no intentions of going out. My intentions were to go to sleep.

"[The Prosecutor]: Sir, I heard your intentions, okay. I understand—

"[The Defendant]: I didn't know side effects of Ambien would make me sleep drive and sleepwalk. There was no warnings on the prescription then. I did not know this.

"[The Prosecutor]: Before, sir, where did you first hear—

"[The Defendant]: I don't even take anything no more because I'm so devast[at]ed about pills now. I'm petrified about pills.

"[The Prosecutor]: That's a good thing, sir. That's a good thing. Sir, where [did] you first hear that term sleep driving? From one of your attorneys?

"[Defense Counsel]: That's not a proper question, Your Honor.

"The Defendant: Almost everybody—

"[Defense Counsel]: Objection. Hold on.

"The Court: I'll sustain the objection as to the form of the question with the last part."

We begin by setting forth the applicable legal principles that guide our review of the claim that the prosecutor's question denigrated defense counsel. "It has been held improper for the prosecutor to impugn the role of defense counsel. . . . In particular, [i]t is improper for a prosecutor to tell a jury, explicitly or implicitly, that defense counsel is employing standard tactics used in all trials, because such an argument relies on facts not in evidence and has no bearing on the issue before the jury, namely, the guilt or innocence of the defendant. . . . There is a distinction [however] between argument that disparages the integrity or role of defense counsel and argument that disparages a theory of defense." (Citation omitted; internal quotation marks omitted.) *State* v. *Fasanelli*, 163 Conn. App. 170, 180, 133 A.3d 921 (2016).

We next consider the prosecutor's question in the context in which it occurred. The defendant testified that he went to sleep the night of the accident and that the Ambien caused him to sleep drive. The prosecutor challenged this theory of defense in several respects, including by asking the defendant if he previously had maintained a different theory of defense. In doing so, the prosecutor elicited testimony in which the defendant recalled asking the former prosecutor assigned to the case to look into whether someone else exited the driver's side

of his car after the accident "because [another] attorney told [him] that." Shortly thereafter, the defendant stated twice that he communicated that possibility because his attorney had told him about it. In this context, we conclude that the prosecutor's question, asking the defendant if he first heard of sleep driving from one of his attorneys, was part of a broader line of inquiry intended to rebut the theory of defense posed on direct examination. Moreover, a factual predicate for the question existed in that it referenced the defendant's prior testimony that he communicated certain information to the former prosecutor based on what a prior defense attorney told him. See *State* v. *Diaz*, 348 Conn. 750, 775–76, 311 A.3d 714 (2024) ("[I]t is entirely appropriate to ask properly phrased questions on cross-examination that relate to the credibility of a criminal defendant's direct testimony, even if those questions exceed the scope of the questioning on direct examination and refer to facts not in evidence. . . . A cross-examiner may ask questions that are 'designed to rebut, impeach, modify, or explain any of the defendant's direct testimony . . . if he or she has a good faith belief that a factual predicate for the question exists.'" (Citations omitted.)).

To the extent the defendant argues that the prosecutor's question implied that defense counsel intended to mislead the jury, he fails to demonstrate how the inquiry amounted to such an implication. Although generally applied to claims of impropriety committed during closing argument, and not cross-examination, we find it instructive that "[o]ur Supreme Court has repeatedly frowned upon a prosecutor's use of terms and phrases that imply that defense counsel 'had not based his argument on fact or reason, but had intended to mislead the jury by means of an artfully deceptive argument.' . . . [See] *State* v. *Albino*, 312 Conn. 763, 776–77, 97 A.3d 478 (2014) (holding improper prosecutor's comparison of defense counsel's tactics to octopus' defense mechanism of releasing ink to hide and deceive); *State* v. *Maguire*, 310 Conn. 535, 557, 78 A.3d 828 (2013) ('smoke and mirrors' was improper because it implied deception);

but see *State* v. *Fauci*, [282 Conn. 23, 39–40, 917 A.2d 978 (2007)] (holding 'red herring' to be proper because it was in response to defense counsel's theory of defense); *State* v. *Nixon*, [91 Conn. App. 333, 338, 880 A.2d 199] ('defendant will most likely try to distract you from the big picture' not improper . . . ) [cert. denied, 276 Conn. 911, 886 A.2d 426 (2005)]; *State* v. *Young*, 76 Conn. App. 392, 405, 819 A.2d 884 (prosecutor's comment that jury should not . . . be ' "fooled" ' or distracted by defense counsel's argument was proper), cert. denied, 264 Conn. 912, 826 A.2d 1157 (2003); *State* v. *Jenkins*, 70 Conn. App. 515, 536–38, 800 A.2d 1200 (' "diverting you from the facts" ' not improper), cert. denied, 261 Conn. 927, 806 A.2d 1062 (2002)." (Citation omitted.) *State* v. *Fasanelli*, supra, 163 Conn. App. 181. Accordingly, we conclude that the question was not improper.

The defendant next claims that "the prosecutor continued to denigrate defense counsel and comment on the defendant's right to counsel during her rebuttal closing argument" with the remark: "I submit to you the defendant probably never heard about [sleep driving] until an attorney put that idea in his head." We are not persuaded.

The following colloquy is relevant to our review of this argument:

"[The Prosecutor]: Ladies and gentlemen, the only evidence of the sleep driving, which I submit to you the defendant probably never heard about until an attorney put that idea in his head.

"[Defense Counsel]: Objection, Your Honor.

"The Court: It's closing argument.

"[Defense Counsel]: There's no evidence of anything like that.

"The Court: Ladies and gentlemen, arguments of counsel are just that, they're arguments to help you assist

with the evaluation of the case. I'll allow the comment. Go ahead."[4]

Like the prior instance, we find the comment to be part of a larger argument rebutting the defendant's theory of defense and that the defendant has failed to show that the prosecutor's comment amounted to the implication that defense counsel sought to mislead the jury. In addition, we note that prosecutors are afforded generous latitude in arguing their cases forcefully during closing argument provided that the argument is "fair and based [on] the facts in evidence and the reasonable inferences to be drawn therefrom." (Internal quotation marks omitted.) *State* v. *Antwon B.*, supra, 236 Conn. App. 456. As already noted, the prosecutor's commentary on this point was connected to the testimonial evidence offered by the defendant. Therefore, the comment was not improper.

## C

### Appeals to the Emotions of the Jurors

The defendant identifies nine comments that the prosecutor made during closing argument that he claims "were highly prejudicial" in appealing to the jurors' emotions. He argues that "[t]here are no reasonable explanations for these statements other than to inflame the passion of the jur[ors] . . . ." We disagree.

"[I]t is well established that, [a] prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . [S]uch appeals should be avoided because they have the effect of diverting the jury's attention from [its] duty to decide the case on the evidence. . . . When

---

[4]The defendant also asserts that the prosecutor's comment was improper on the basis that it did not adhere to the court's prior ruling in which it sustained defense counsel's objection to the question asking the defendant if he first heard of sleep driving from one of his attorneys. The defendant, however, fails to recognize the fact that the court allowed the comment when defense counsel objected. Because it explicitly was allowed by the court, we are not convinced that this comment did not adhere to the court's prior ruling. Accordingly, we conclude that the comment was not improper on this basis, either.

the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal. . . . It must be acknowledged that the line between comments that risk invoking the passions and prejudices of the jurors and those that are permissible rhetorical flourishes is not always easy to draw. The more closely the comments are connected to relevant facts disclosed by the evidence, however, the more likely they will be deemed permissible. . . . A prosecutor is permitted to use vivid language to describe the nature and enormity of the crime when supported by the evidence, and to the extent that such language appeals to the emotions of the jurors, it is because of the nature of the crime and not because of the terminology the prosecutor used to get his [or her] point across. . . . Thus, comments that are factually based on the evidence and not unduly provocative constitute permissible argument." (Citations omitted; internal quotation marks omitted.) *State* v. *Daye*, 159 Conn. App. 831, 846, 123 A.3d 894, cert. denied, 319 Conn. 949, 125 A.3d 529 (2015).

Given their similarities, we consider together the following two comments that the defendant claims amount to impropriety. In the first instance, the prosecutor remarked: "And again, bad things happen every day, right, you hear about it in the news, but this was not an act of God, this was preventable." In the second, the prosecutor stated: "This is everybody's wors[t] nightmare what this defendant did. I mean you hear about it on the news all the time, drunk drivers causing crashes like this and you are hearing it live here in the courtroom and unfortunately, she ran into a drunk driver that night, which caused this tremendous loss of life."

The defendant argues that "the state focused on whether the crime was preventable or not, which is not an element of the crimes charged." We note, however, that immediately following the statement that the accident was preventable, the prosecutor elaborated, "This

happened solely because . . . the defendant in this case, decided to drink to [ex]cess, and again, the drugs were put in just for the sake of completeness." Read in context, the prosecutor's comment that the accident was preventable sought to rebut the theory of defense that the accident was caused by sleep driving and to argue that it was caused by the defendant's conscious decision to drink to excess and to drive. The preventable nature of the accident also speaks to whether the defendant acted recklessly, which is an element of certain crimes charged. Moreover, the comment would not have distracted from the jury's appraisal of the facts because it was supported by the evidence showing that the amount of alcohol the defendant consumed is what caused him to drive erratically and collide with another car, killing two people and severely injuring two others.[5]

Turning to the comments that bad things happen every day, that you hear about drunk driving accidents in the news, and that this is everybody's worst nightmare, while not buttressed by specific evidence, all fall squarely within the scope of the jurors' common knowledge of the nature and danger associated with drunk driving. See *State* v. *Bothwell*, 78 Conn. App. 64, 73, 826 A.2d 182 ("[i]t is well established that arguments that appeal to

---

[5]Specifically, Powers, the state's expert in forensic toxicology, testified that, at the time of the accident, the defendant's BAC was between 0.16 and 0.20 and that a BAC of 0.20 equates to someone having "ten [standard drinks] in an hour plus another drink per hour of drinking." When asked to explain how someone with a BAC within this range would drive, Powers testified, "I'd be expecting excursions off the sides . . . significant issues in terms of recognizing and reacting and responding to anything unusual or unexpected, inappropriate speed. . . . Bad judgments, bad timing, bad perceptions and reactions to information, road signs, change in road structure, curves, recognition of what other cars are doing, recognition of hazards that roadway represents, and one's own actions in light of those roadways. But, in terms of simply functioning, putting the car in gear and driving down the road, sure, just maybe not staying on the road very well." In addition, three eyewitnesses testified that they observed the defendant's Honda driving in a manner consistent with Powers' description—that it was being driven erratically at a high rate of speed down the wrong side of the road and collided with the Mazda.

the common knowledge and experience of the jurors are permissible during closing arguments"), cert. denied, 266 Conn. 908, 832 A.2d 72 (2003). Finally, the comment that the accident "caused this tremendous loss of life" refers to the fact in evidence that two people died as a result of the accident. Accordingly, we do not find these comments, which draw on the facts in evidence or the jurors' common knowledge, to be unduly provocative, and, thus, they were not improper.

The defendant also argues that it was improper for the prosecutor to remark: "He was moved to tears because of the tragic loss of life in this case, because of what happened was so easily preventable if the defendant didn't drink and drive." The first part of this statement refers to the state's eyewitness Kevin Harris, who, during his testimony describing his firsthand account of the accident, acknowledged, "sorry, I'm going to get all choked up again, it was one of those experiences where I saw the other car coming up the hill and, sorry, I brought a tissue this time." The prosecutor's comment merely reflected witness conduct, specifically the testimony of Harris. Additionally, as previously discussed in this opinion, the portion of the comment describing the accident as preventable if the defendant did not drink and drive was in response to the defendant's theory of defense, related to an element of crimes charged, and was supported by the facts in evidence. Accordingly, we conclude that this comment was not improper.

The defendant also claims that it was improper for the prosecutor to state: "We all want to be safe when we're driving." In reviewing this claim, we consider the context in which this comment was made, which was as follows: "And again, these four eyewitnesses, including [Michaud], they don't know each other. They didn't get together to conspire against the defendant. They have really, you know obviously [Michaud] has some interest because she lost he[r] husband here and her two close friends. But none of these other individuals know the defendant. None of them have some type of vendetta

or ax to grind against him, they're simply telling you what they saw that night. And in the words of [eyewitness] Patrick Carroll, right, he said that he stopped and he came forward and came into the Farmington Police Department because we all want to be safe. We all want to be safe when we're driving.'' The prosecutor's comment referenced a quote from Carroll, who testified that he was motivated to provide the police with his account of the accident because ''we have to stay safe.'' We find that this comment was part of a proper argument concerning the motives of the witnesses and that it would not distract from the jurors' appraisal of the evidence, as it was factually connected to the testimony already heard and observed by the jury. The comment, therefore, was not improper.

The defendant also claims that it was an improper appeal to the jurors' emotions for the prosecutor to state that ''bad things happen to good people.'' Following this comment, the prosecutor described the victims' perspective, including that they were travelling from Canada to ''pay their respect to a loved one [at] a funeral,'' that Michaud, the driver, had ''not a bit of alcohol in her system,'' and that she was driving on the correct side of the road and under the speed limit to find their hotel. In this context, we find this comment was an attempt to cast sympathetic light on the victims by illustrating their perspective before the accident occurred and that it did not distract from the overall argument. See *State* v. *Patterson*, 170 Conn. App. 768, 794, 156 A.3d 66 (2017) (The prosecutor's comments that the victims were '' 'pretty much teenagers' '' and that the situation was a '' 'very stressful event' '' ''were not calculated to lead the jury to find the defendant guilty out of sympathy for [the victims].'' Rather, the prosecutor ''cast [the victims] in a sympathetic light without distracting the jury from the main point of his argument, mainly, that the defendant was the person responsible for attempting to steal [one of the victim's] property.''), cert. denied, 325 Conn. 910,

158 A.3d 320 (2017). Accordingly, we conclude that this comment was not improper.

The defendant next claims that it was improper for the prosecutor to compare the defendant's drinking and driving to firing a gun into a crowd. Specifically, the prosecutor remarked: "It was the equivalent of firing a gun into a crowd. Because when you get behind the wheel of a car, it becomes almost like a dangerous instrument, right, you could kill somebody with it if you're careless, that's why there are rules against drinking and driving." The prosecutor employed a rhetorical device to convey the nature of the crime, illustrate two of the relevant criminal elements—that the defendant acted recklessly and under circumstances evincing an extreme indifference to human life—and, thus, rebut the defense theory that the defendant was sleep driving. See *State* v. *Tilus*, 157 Conn. App. 453, 483, 117 A.3d 920 (2015) (it was not improper for prosecutor to use "relevant rhetorical device aimed at defeating one possible view of the defense"), appeal dismissed, 323 Conn. 784, 151 A.3d 382 (2016). Continuing his argument that the prosecutor improperly appealed to the jurors' emotions, the defendant contends that "[t]here are no reasonable explanations for these statements other than to inflame the passion of the jur[ors], taking advantage of the general public's fears of gun violence . . . ." It is not clear, however, how a fear of gun violence would distract from or influence the jurors' consideration of a case that does not implicate gun violence in any respect. We, therefore, do not find this comment unduly provocative and conclude that it was not improper.

The defendant additionally claims that the prosecutor improperly appealed to the emotions of the jurors with the following comment: "And, if it wasn't [Michaud's] car that was hit that night, I guarantee you that the defendant would have driven into somebody else." By indicating that another human life would have been harmed if it were not Michaud and her passengers, the prosecutor utilized descriptive language to portray that

the defendant acted in accordance with a requisite element of the crime—under circumstances evincing an extreme indifference to human life. Furthermore, this description finds support in the evidence showing the defendant consumed an excessive amount of alcohol, and then, while driving under the influence, hit an exit sign and then proceeded to drive on the wrong side of the road while traveling at a high rate of speed. We, therefore, conclude that this comment was not improper.

The defendant also claims that it was improper for the prosecutor to state: "It's amazing that [Michaud] is even able to walk away from this and survive, to be able to be here and testify." We note that immediately after this statement, the prosecutor continued: "The magnitude of the damage there and the debris field that you heard Officer [Ryan] Dery testify to and also Detective [Eric] Augustyn that with the amount of debris in the direction it was going and the area of impact, that's how they were able to determine where the crash occurred. So, again, she made a decision to try and brake and unfortunately she wasn't able to avoid the defendant's vehicle. He crashed into her and caused this tremendous loss of life . . . ." In this context, the prosecutor's statement was part of broader commentary on the enormity of the accident. This statement was supported by evidence that the defendant's Honda was traveling at a high rate of speed and hit the Mazda that Michaud was driving head on, that the Mazda was caused to spin such that it ultimately ended up on the other side of the highway facing the opposite direction in which it was driving, and that two passengers died as a result of the collision and a third passenger was hospitalized for more than one month.

We now turn to the defendant's final claim that the prosecutor improperly appealed to the jurors' emotions with the following comment: "I submit to you that he was—he probably had a drinking problem even though he won't admit it to you, but he drank like that because he liked the feeling." The defendant asserts that this statement "was contrary to [the defendant's] testimony and an

improper appeal to the emotions of the jur[ors] because of the stigma surrounding substance abuse." The state responds that this argument "fails because, although the defendant denied having a drinking problem, other evidence in the record supported this argument." We agree with the state.

Powers estimated that at the time of the accident, the defendant's BAC was twice the legal limit, between 0.16 and 0.20, and calculated that someone would have had to consume ten standard drinks in one hour plus another drink per hour of drinking to reach a BAC of 0.20. Additionally, the state introduced into evidence a hospital record noting that the defendant reported that he typically drinks a six-pack of beer each night. Finally, the defendant testified that, on the evening of the accident, he consumed two Bloody Mary drinks "because I was thirsty and hungry and those are like liquid meals." Because there was evidence in the record supporting the prosecutor's comment, we conclude that it was not improper.

## D
### Facts Not in Evidence

The defendant claims that the prosecutor made several comments during cross-examination of the defendant that were improper because they referred to facts not in evidence.[6] With the exception of one comment, we do not find the prosecutor's statements to be improper.

As previously noted, "it is entirely appropriate to ask properly phrased questions on cross-examination that relate to the credibility of a criminal defendant's direct testimony, even if those questions exceed the scope of the questioning on direct examination and refer to facts not in evidence. . . . A cross-examiner may ask questions

---

[6]Because the defendant claims that some of these comments also improperly appealed to the emotions of the jurors and because we already addressed in this opinion those comments and whether they were supported by the facts in evidence, we decline to give them separate consideration under this section.

that are 'designed to rebut, impeach, modify, or explain any of the defendant's direct testimony . . . if he or she has a good faith belief that a factual predicate for the question exists.' " (Citations omitted.) *State* v. *Diaz*, supra, 348 Conn. 775–76.

Additionally, "[g]ratuitous commentary[7] during cross-examination can be improper, particularly if it is sarcastic, provocative, or aggressive. See, e.g., *State* v. *Wilson*, 308 Conn. 412, [443], 64 A.3d 91 (2013) ('the prosecutor's sarcastic "congratulations," offered three times [and] over defense counsel's objection, constituted "an excessive and inappropriate use of sarcasm" '); *State* v. *James R.*, 138 Conn. App. 181, 192, 50 A.3d 936 (state acknowledged that prosecutor's editorial comment ' "[o]f course you do" ' during defendant's cross-examination was improper commentary), cert. denied, 307 Conn. 940, 56 A.3d 949 (2012). However, although objectionable, not all gratuitous prosecutorial commentary during cross-examination rises to the level of impropriety. See, e.g., *State* v. *Andrews*, 313 Conn. 266, 292, 96 A.3d 1199 (2014) (concluding that prosecutor's remark, ' ". . . [c]ome on," ' was not improper because it was intended 'to encourage the defendant to testify truthfully as to his prior experience in giving, or understanding the purpose of, written statements to the police'); *State* v. *Grant*, 154 Conn. App. 293, 322, 112 A.3d 175 (2014) (concluding that prosecutor's remark ' "really?" ' was not improper because it was 'an attempt to confirm the truth or to clarify the defendant's responses to his questions'), cert. denied, 315 Conn. 928, 109 A.3d 923 (2015). To determine whether an impropriety exists, we must 'consider each alleged impropriety in the context in which it occurred,' while remaining aware that our review is 'constrained by our inability to assess the tone and body language of the prosecutor . . . and the limitations necessarily imposed by our reliance on the cold, printed

---

[7]"Gratuitous commentary includes, but is not limited to, statements, remarks, and asides that are argumentative or editorial in nature." *State* v. *Diaz*, supra, 348 Conn. 776 n.14.

record.'" **(Footnote in original.)** *State* v. *Diaz*, supra, 348 Conn. 776–77.

The defendant first claims that it was improper for the prosecutor to remark: "Sir, unless you downed the entire bottle of [vodka] that goes in there, there's no way your blood alcohol level was the equivalent it was, okay, so that's not what I'm asking." The state responds that the comment was "grounded in the evidence given Powers' testimony that the defendant's BAC demonstrated that he had ingested approximately ten standard drinks within an hour." In his reply brief, the defendant contends that the state's argument falls short because "Powers testified about different scenarios but specified that they are 'assumptions' and 'estimates.'" We agree that the comment was grounded in the evidence.

The following procedural history is relevant to this claim. Powers testified that a standard drink in a person of average size would generate a BAC of 0.02 grams per deciliter and that one and one-half ounces of distilled spirits amount to one standard drink. He also testified that the state lab's test results showed that the BAC of the defendant was 0.18 at 12:50 a.m., which was about one hour after the accident. To determine the BAC of the defendant at the time of the accident, Powers testified that he conducted a process referred to as back extrapolation, explaining that he needed to know the rate of elimination of alcohol content in the blood and to "make the reasonable assumption that alcohol hasn't been ingested during the time period that you're back extrapolating." He calculated the defendant's rate of elimination to be about 0.02 on the basis of the two blood draws by the hospital. Because Powers did not know when the defendant stopped drinking, he testified that he developed two scenarios based on two different assumptions: the first assumed the defendant stopped drinking more than one-half hour before the accident and the second assumed the defendant stopped drinking sometime within the half hour before the accident. Considering these assumptions, Powers estimated that

the defendant's reasonable range of BAC at the time of the accident was **0.16** to **0.20**. In the scenario in which the drinking ceased more than one-half hour before the accident, Powers estimated the defendant's BAC to be around **0.20** at the time of the accident. As to the amount of alcohol a person would need to consume to reach a BAC of **0.20**, he further testified that, "[i]n a normal size person, that would [be] ten [standard drinks] in an hour plus another drink per hour of drinking. So, if somebody was drinking for four hours, that would be thirteen drinks, thirteen, fourteen drinks, around in that. Standard drinks, okay."

The comment at issue was made during the state's cross-examination of the defendant as follows:

"[The Prosecutor]: If it's reported in your medical records that you reported to the hospital staff that you had a problem with alcohol, that would not be correct? Is that what you're telling this jury that you did not have a problem with drinking?

"[The Defendant]: I'm telling you that night I drank two Bloody Marys.

"[The Prosecutor]: I'm not asking you about that, sir, that's not what I'm asking you.

"[The Defendant]: That's what I'm telling you.

"[The Prosecutor]: Sir, unless you downed the entire bottle of the Bloody Mary of the vodka that goes in there, there's no way your blood alcohol level was the equivalent it was, okay, so that's not what I'm asking."

Instead of responding to the prosecutor's question asking if he had a drinking problem, the defendant chose to repeat nonresponsive testimony offered during direct examination that he consumed only two Bloody Mary drinks on the night of the accident. We find that the prosecutor's comment considered in context was not improper because it sought to impeach the defendant's

testimony and was supported by the evidence presented at trial.

Next, the defendant claims that it was improper for the prosecutor to comment: "You should feel terrible for it, you killed two people." The state concedes that this comment "was gratuitous, ill-advised, and can be viewed as improper." We agree.[8]

The defendant also claims that it was improper for the prosecutor to comment during cross-examination of the defendant: "Sir, you weren't concerned about the two people that you killed, you were concerned about the fact that you were going to get in trouble . . . ." The defendant argues that, if the prior comment "is admittedly improper, then the prosecutor saying the same thing a second time is also improper." We are not persuaded.

The following procedural history is relevant. During his direct examination of the defendant, defense counsel introduced a portion of the defendant's hospital record from the night of the accident, in which a member of the medical staff reported: "Patient now stating, 'Is it a big deal? Am I in trouble?'" When defense counsel asked why he asked those questions, the defendant testified, "because I've never gotten a DWI in my life, that's why

---

[8]The colloquy in which the improper comment was made occurred as follows:

"[The Prosecutor]: Sir, are you willing to say whatever it takes to get away with what happened?

"[Defense Counsel]: Objection, Your Honor.

"The Defendant: No.

"[Defense Counsel]: That's not a fair question.

"The Defendant: No. I don't. And I feel terrible about—

"The Court: One second. One second. One second.

"The Defendant: And I feel terrible that I hurt her and two people got killed.

"[The Prosecutor]: Sir.

"The Defendant: I'm devast[at]ed over this. This is terrible.

"The Court: One second, sir. So I'm—

"The Defendant: It's not true.

"The Court: I'm going to overrule the objection.

"[The Prosecutor]: You should feel terrible for it; you killed two people."

I have dealer plates. This [is] what I do." He continued that it is a "big responsibility to have that and it's not easy to get one of those, so I wouldn't drink and then go out with a dealer plate, I would never do that." Shortly thereafter, the defendant stated that, while at the hospital, he was "scared and worried." When asked why he was scared and worried, the defendant responded: "Because of what happened to some people that I hurt, which I never ever, ever in my life wanted to do something like that. I was devast[at]ed over that. And what was going to become, the consequences after this what happened, I was freaked out of my mind."

On cross-examination, the prosecutor followed up on this line of questioning and asked the defendant if he was worried about getting in trouble, to which he replied: "Of course I was worried about getting [in] trouble, I just did a terrible thing, I got in a car accident." The prosecutor then asked, "And it was after you found out that you were in this crash and that you killed two people that you suddenly started saying you didn't remember, isn't that what happened?" The defendant responded by stating, "That's not true." Shortly thereafter, the prosecutor asked again, "[W]hat I'm asking you is if you were worried about getting in trouble?" The defendant responded, "I got into a car accident. I have a dealer [plate], of course I'm worried I'd get in trouble." Further on in the colloquy, the prosecutor asked the defendant if he remembered a member of the hospital staff offering him a phone to call his girlfriend, but that he said he was "too depressed." He responded, "I'm sure I was depressed, yes. I just got in a car accident. I wasn't happy." The prosecutor then followed up with the comment at issue: "Sir, you weren't concerned about the two people that you killed, you were concerned about the fact that you were going to get in trouble."

This comment, although arguably gratuitous, does not amount to impropriety. Unlike the prior comment, in which the prosecutor opined on how the defendant should feel, this comment sought to clarify the defendant's varying testimony. Specifically, the prosecutor's

comment attempted to expand upon the reason for the defendant's depression, such as the loss of his dealer plates, as he previously testified. In doing so, the prosecutor attempted to highlight the defendant's motivations as a means of challenging the veracity of his defense. The defendant argues that the statement references facts not in evidence; however, he explicitly testified that he was concerned about getting in trouble and what that could mean for his dealer plates. We, therefore, conclude that this comment was not improper.[9]

## E
### References to Pretrial Custody
### and Potential Penalties

The defendant also claims that the prosecutor improperly "commented on the defendant's pretrial custody

---

[9]The defendant also asserts that it was improper for the prosecutor to comment: "Well, sir, in fact you want to retract that statement." The prosecutor made this statement following the previous comment we considered and occurred as follows:

"[The Prosecutor]: Sir, you weren't concerned about the two people that you killed, you were concerned about the fact that you were going to get in trouble—

"[The Defendant]: That's not true. That's not true.

"[The Prosecutor]: Just as you are here right now.

"[The Defendant]: I am devast[at]ed that two people got killed, I'm devast[at]ed two people got hurt bad. I'm not a monster. I don't go out hurting people.

"[The Prosecutor]: Well, sir, in fact you want to retract that statement."

Aside from characterizing the comment as referring to facts not in evidence, the defendant's appellate brief does not offer any analysis expounding upon the comment's meaning or why it is improper. The state contends that the comment was in response to the defendant's testimony that he did not "go out hurting people" and that it "is undisputed that the defendant caused the collision which resulted in the death of two victims and serious injuries of two others." Our Supreme Court has stated that "[w]e are mindful . . . that closing arguments of counsel . . . are seldom carefully constructed in toto before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear. While these general observations in no way justify prosecutorial [impropriety], they do suggest that a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." (Internal quotation marks omitted.) *State* v. *Schiller*, 115 Conn. App. 189, 196, 972 A.2d 272, cert. denied, 293 Conn. 910, 978 A.2d 1113

and supervision, as well as the potential penalties and consequences he would face if convicted." In support of this claim, the defendant's appellate brief offers a single paragraph devoid of any legal authority and consisting of conclusory assertions without any analysis. Although he contends that "[i]t is improper and extremely prejudicial for the jury to hear any information regarding the defendant's possible detention as it may sway their verdict," he fails to provide any individualized analysis illustrating how any of the eight identified comments amounted to impropriety. Moreover, the defendant does not delineate between comments that he contends are improper for referring to pretrial custody and those referring to penalties. "We repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." (Internal quotation marks omitted.) *State* v. *James R.*, supra, 138 Conn. App. 186. The defendant has failed to adequately brief his claim as it concerns these remaining comments and, thus, we decline to address them.

## II

Because we determined that one of the prosecutor's comments to the defendant during cross-examination was improper, we now consider whether, under the *Williams* factors, this impropriety deprived the defendant of a fair trial. "The defendant bears the burden of demonstrating that, when considered in light of the whole trial, the improprieties were so egregious that they amounted to a denial of due process. . . . [O]ur determination of whether any improper conduct by the [prosecutor] violated the defendant's fair trial rights is predicated on the factors set forth in *State* v. *Williams*, [supra, 204 Conn. 540], with due consideration of whether that [impropriety] was objected to at trial. . . . Those factors include the

(2009). Because we cannot decipher the meaning of the prosecutor's comment, we cannot conclude it was improper.

extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case. . . . Ultimately, [t]he issue is whether the prosecutor's conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process." (Internal quotation marks omitted.) *State* v. *Antwon B.*, supra, 236 Conn. App. 468–69. After examining each factor, we conclude that the impropriety committed by the prosecutor did not impermissibly infringe on the defendant's due process rights such that he was deprived of a fair trial. See *State* v. *Maurice B.*, 228 Conn. App. 720, 744, 324 A.3d 850, cert. denied, 350 Conn. 929, 326 A.3d 249 (2024).

First, our review of the record reveals that the prosecutor's comment "[y]ou should feel terrible for it, you killed two people" was not invited by defense conduct or argument, nor does the state argue that it was. Turning to the alleged severity of the comment, "we look to whether the [improprieties were] blatantly egregious or inexcusable." (Internal quotation marks omitted.) *State* v. *Courtney G.*, 339 Conn. 328, 362, 260 A.3d 1152 (2021). The prosecutor's comment almost immediately followed the defendant's admission that he felt terrible that two people had been killed. Against this backdrop, the prosecutor's comment was not so capricious such that it diverted the jurors' attention from the defendant's testimony. Additionally, defense counsel did not object to the prosecutor's comment, which "demonstrates that defense counsel presumably [did] not view the alleged impropriety as prejudicial enough to jeopardize seriously the defendant's right to a fair trial." (Internal quotation marks omitted.) Id. In terms of frequency, after the defendant responded to the comment, the prosecutor moved on to a different question and did not repeat this

improper remark.[10] We, therefore, conclude that the impropriety was not frequent.

Additionally, the comment was not central to the critical issues of the case, as it concerned how the defendant should feel about his conduct at the time of trial. The critical issues of the case concerned whether the defendant possessed the requisite general intent—specifically, whether he acted recklessly and under circumstances evincing extreme indifference to human life. The defendant's theory of defense was that he was sleep driving and thus could not form the requisite intent to satisfy those elements. The prosecutor's opinion as to how the defendant should feel years after the accident occurred likely would not influence the jury's assessment of these issues.

Furthermore, because defense counsel did not object to the prosecutor's comment, the court did not take any curative measures. See *State* v. *Santiago*, 269 Conn. 726, 762, 850 A.2d 199 (2004) ("the defendant, by failing to bring them to the attention of the trial court, bears much of the responsibility for the fact that [the] claimed improprieties went uncured" (internal quotation marks omitted)); see also *State* v. *Antwon B.*, supra, 236 Conn. App. 470. Because we do not find this comment to be so blatantly egregious or inexcusable as to warrant curative measures, especially in the absence of an objection, the fact that no curative measures were taken does not weigh heavily in our evaluation.

Finally, the state presented a strong case. Three eyewitnesses testified that they saw the defendant's Honda being driven erratically on Colt Highway immediately prior to the accident occurring, and two of those witnesses observed the defendant's Honda, while being

---

[10] As noted, the defendant argues that, if this statement "is admittedly improper, then the prosecutor saying the same thing a second time is also improper" and cites the comment: "[Y]ou weren't concerned about the two people that you killed; you were concerned about the fact that you were going to get in trouble . . . ." See part I D of this opinion. Because we did not find that the latter comment was improper, we do not consider it in our assessment of the impropriety's frequency.

driven on the wrong side of the road, crash into the Mazda. Multiple law enforcement and public safety workers testified that they saw the defendant seated in the driver's seat immediately following the accident. They also testified that they smelled alcohol emanating from the defendant and his vehicle and that the defendant exhibited signs of intoxication. Although the defendant testified that he intended to go to sleep that night and that is why he took his prescription Ambien, he also testified that he consumed two Bloody Mary drinks along with his Ambien.

Furthermore, Powers testified that the defendant had a BAC of 0.18 about one hour after the accident and that, based on his calculations, the defendant had a BAC between 0.16 and 0.20 at the time of the accident. His testimony further explained that a BAC of 0.20 equates to an individual having consumed about ten standard drinks in one hour, plus one drink per hour of drinking. Powers also testified that he would expect someone with a BAC within the 0.16 to 0.20 range to drive erratically and to fail to adjust to changes or elements in the road. This assessment was consistent with the eyewitness testimony describing the defendant's Honda as not maintaining its lane, being driven at a high rate of speed, being driven on the wrong side of the road and crashing into an oncoming car.

In light of the foregoing, we conclude that the impropriety committed by the prosecutor during cross-examination of the defendant did not implicate the fairness of the trial.

The judgment is affirmed.

In this opinion the other judges concurred.